No. 68,384

In the Matter of Hesston Corporation (Appraisal and Determination of Value of $1.60 Cumulative Convertible Preferred Stock).

Hesston Corporation, *Appellee/Cross-Appellant,* v. Latham G. Kays, Joan H. Kays; Robert L. Parlette; Linda Evans Parlette; Nicholas A. Halford; Santa Clara Valley Corp.; Alfred L. Anna; Blanche E. Anna; James P. Brooks; Janice M. Brooks; Lillian A. Colby, Jr.; Christopher R. Dress; Norman L. Guittar; Norman L. Guittar, Trustee UA for Norman L. Guittar Trust; John W. Hemmer; John F. Hutson; Jay Johnson; Eleanore A. Kirchmer, Trustee for Eleanore A. Kirchmer Trust; John Meyer; Barbara H. Meyer; Roy E. Partenheimer; Margaret G. Partenheimer; George J. Schodroski; Leonora A. Schodroski; Russell P. Siebert; Jean M. Siebert; Green Valley Corp.; Salinas Valley Corp.; Barry Swenson; Molly Swenson; F.X. Fitzpatrick; John Llewellyn; and Judith Llewellyn, *Appellants/Cross-Appellees.*

(870 P.2d 17)

Opinion filed March 11, 1994.

*Deborah A. Elvins*, of Stoel, Rives, Boley, Jones & Grey, of Seattle, Washington, argued the cause, and *Kenneth G. Gale*, of Focht, Hughey & Calvert, of Wichita, was with her on the briefs for appellants.

*Robert L. Howard*, of Foulston & Siefkin, of Wichita, argued the cause, and *Gerald Sawatzky* and *Trisha A. Thelen*, of the same firm, were with him on the briefs for appellee.

The opinion of the court was delivered by

ALLEGRUCCI, J.: This case involves a dispute between Hesston Corporation (Hesston) and certain holders of its $1.60 Preferred Stock (dissenters) over the price the dissenters should receive for their stock for the purpose of a cash-out merger. Hesston initiated the action, seeking appraisal of the stock under K.S.A. 17-6712 and validation of the terms of the merger. Dissenters counter-claimed for recovery of the stock's redemption value plus accrued dividends. They alleged breaches of contract and of fiduciary duty. The district court ruled that the claims of some dissenters were barred by their accepting payment for their stock. On the merits, the district court entered judgment in favor of Hesston following a trial to the court. Dissenters appealed, and Hesston cross-appealed from the district court's refusal to impose sanctions pursuant to K.S.A. 1993 Supp. 60-211.

The dissenters raise four issues in their appeal. They allege that the district court erred in (1) exercising personal jurisdiction over the nonresident shareholders, (2) holding that the dissenters were barred from pressing claims against Hesston, (3) concluding that there was no breach of contract by Hesston, and (4) concluding that the Hesston Board of Directors did not breach its fiduciary duty to the dissenting shareholders.

Hesston is a Kansas corporation which was formed in 1949 and became publicly held in 1968. Its principal business has been the manufacture and sale of farm equipment.

The stock which is at the heart of this controversy was issued in 1975. A Certificate of Designations, Preferences and Rights of Preferred Stock (Certificate) was filed with the Kansas Secretary of State, and the stock was designated "$1.60 Cumulative Convertible Preferred Stock" ($1.60 Preferred Stock).

The defendants/appellees (dissenters) were holders of the $1.60 Preferred Stock who refused to tender their stock certificates in exchange for the payment of $12.50 per share as provided in a 1989 merger agreement between Hesston and Fiat Trattori S.P.A. (Fiat). Most of the dissenters purchased their $1.60 Preferred Stock on the advice of defendant/appellee Latham Kays, a stockbroker, after Hesston gave public notice in January 1987 that it had received a merger proposal from Fiat which would pay $12.50 per share for the stock. Kays advised his clients that Fiat probably could be forced to pay more, and in January 1987 he wrote to Hesston on behalf of his clients, demanding the redemption price plus accrued dividends.

In 1977, Fiat acquired approximately 40% of Hesston's voting stock. Fiat's acquisitions included a majority interest in the common stock and all 600,000 shares of a new issue of preferred stock, the $.60 Cumulative Convertible Preferred Stock. Fiat owned no $1.60 Preferred Stock at that time.

In the 1980s, Hesston's sales declined significantly from the level attained in the late 1970s, and the corporation sustained severe financial losses. Fiat provided short-term financing to Hesston. By the end of 1986, Hesston owed $75,951,000 to Fiat.

In January 1987, Fiat proposed to buy out the publicly held interest in Hesston. At that time, Hesston common stock and $1.60 Preferred Stock were trading on the New York Stock Exchange at $3$^{1}$/$_{4}$ and $8$^{3}$/$_{8}$ respectively. Fiat proposed two separate cash-out mergers; the offer for common stock would be $4 per share, and the offer for $1.60 Preferred Stock would be $12.50 per share.

By January 1987, the Board of Directors of Hesston (Board) was dominated by Fiat employees, former employees, and persons with business ties to Fiat. The Board designated the only two outside directors to be a two-person Audit Committee to study Fiat's proposal and recommend a course of action. Donaldson, Lufkin and Jenrette, an investment banking firm employed by the Board to render a fairness opinion on the consideration offered by Fiat, concluded that

it was financially fair. The law firm of Willkie, Farr & Gallagher was employed as counsel to the Audit Committee and the Board on legal aspects of Fiat's proposal.

In February 1987, as it had been advised, the Board recommended that the stockholders of Hesston approve the merger. In May 1987, a special meeting of Hesston stockholders was held for the purpose of voting on the proposed merger. It was approved by a majority of the holders of common stock. It did not receive, however, the two-thirds affirmative vote of $1.60 Preferred Stockholders required by the Certificate for approval.

In May 1987, the cash-out merger of the publicly held Hesston common stock was completed. A Fiat subsidiary formed a wholly owned shell subsidiary which had no purpose other than to act as a merger partner with Hesston. The two corporations were merged, Hesston became the surviving corporation, and publicly held Hesston common stock was canceled and replaced by a right to receive $4 per share. The cash to be paid to holders of common stock was supplied by Fiat.

In May 1987, when Hesston common stock was canceled through the merger, Hesston Preferred Stock was de-listed and no longer traded on the New York Stock Exchange. In August 1988, Hesston Preferred Stock was de-registered when the number of holders had declined below that which requires registration under the Securities Exchange Act of 1934.

In May 1987, when the cash-out merger of $1.60 Preferred Stock was not approved, Fiat began acquiring shares of $1.60 Preferred Stock in order to obtain the controlling two-thirds majority. At that time, 315,715 of the 447,800 outstanding shares were owned by public stockholders.

Fiat acquired 67,050 shares of $1.60 Preferred Stock at the conclusion of litigation with Allied Products Corporation (Allied). In 1986, Allied had offered to buy Hesston. Fiat had rejected the offer because it did not cover Hesston's unsecured debt to Fiat, and in early 1987, Hesston and Allied filed federal court actions against one another, which were consolidated. In March 1989, Allied dismissed its lawsuit with prejudice and accepted $12.50 per share for each of its 67,050 shares of $1.60 Preferred Stock.

The prices which Fiat paid for the shares of $1.60 Preferred Stock it purchased in order to gain its two-thirds majority are only partially

documented in the record. The district court made a finding that Fiat made open market purchases of 119,149 shares and in only one instance paid more than $12.50 per share. The record does not disclose how many shares were involved in that purchase. The district court also found that Fiat acquired $1.60 Preferred Stock in privately negotiated transactions. The district court made no finding as to the prices paid. However, we know that for some number fewer than 186,199 shares of stock (67,050 plus 119,149), Fiat paid $12.50 or less per share. By the time Fiat took Hesston private in July 1989, Fiat owned 318,284 shares.

In April 1989, a Fiat affiliate (MMS) proposed to merge with Hesston on substantially the same terms as were offered in 1987. Again $12.50 was offered for each share of $1.60 Preferred Stock. The law firm which represents Hesston advised that the expense of a new fairness opinion need not be incurred. No independent investigation was conducted, and no independent financial advisor was retained.

On July 13, 1989, a special meeting of stockholders was held for the purpose of considering the merger proposal, but proxies were not sent to non-Fiat shareholders because approval of the merger was assured by Fiat's ownership of more than two-thirds of the $1.60 Preferred Stock. Pursuant to the merger agreement, $1.60 Preferred Stock was canceled and converted to the right to receive $12.50 per share, and Hesston became a wholly owned subsidiary of Fiat. Fiat, on behalf of MMS, deposited cash in an exchange agent account to pay for the Hesston $1.60 Preferred Stock Certificates surrendered.

In 1989, Hesston's net worth was negative $87,206,000. The money which Fiat deposited for payment of the surrendered Certificates did not appear on Hesston's balance sheet as debt or equity.

Each of the dissenters filed a written objection or demand with Hesston before the vote was taken on the merger, and each dissenter either abstained or voted against the merger. On July 19, 1989, Hesston sent to all dissenters by certified mail a notice that they had 20 days to make a written demand on Hesston for payment of the value of their stock. The notice also stated that a demand was necessary to perfect their rights under K.S.A. 17-6712 as stockholders objecting to the merger. None of the dissenters made a demand.

Some dissenters held shares in a "street name." With regard to this practice, Black's Law Dictionary 1421-22 (6th ed. 1990) states:

"Securities held in the name of a broker instead of his customer's name are said to be carried in a 'street name.' This occurs when the securities have been bought on margin or when the customer wishes the security to be held by the broker. The name of a broker or bank appearing on a corporate security with *blank endorsement* by the broker or bank. The security can then be transferred merely by delivery since the endorsement is well known. Street name is used for convenience or to shield identity of the true owner."

According to the dissenters, shares of $1.60 Preferred Stock held in a street name were tendered by the brokerage firm(s) when the merger became effective. Based upon the admission or agreement of the parties, the district court found that in this way the following dissenters tendered all of their stock to the exchange agent and accepted payment:

Robert and Linda Parlette
Jay Johnson
Green Valley Corp.
Farmers Bank of Delaware IRA Account Salinas Valley Corp.
Santa Clara Valley Corp.
Molly Swenson
Barry Swenson
F.X. Fitzpatrick

The district court found that there were other dissenters who had some but not all of their stock tendered for them. They are John and Barbara Meyer, Nicholas Halford, and John W. Hemmer.

The remaining dissenters are as follows:

Alfred L. and Blanche E. Anna
James P. and Janice M. Brooks
Lillian A. Colby, Jr.
Christopher Dress
Norman L. Guittar and Norman L. Guittar Trust
John F. Hutson
Latham G. and Joan H. Kays
Eleanore A. Kirchmer
John and Judith Llewellyn
Roy E. Partenheimer
George J. and Leonora A. Schodroski
Russell P. and Jean M. Siebert

The total number of shares of $1.60 Preferred Stock owned by dissenters and not tendered by brokerage firm(s) is 10,710.

In the statutory appraisal proceeding brought by Hesston, the value of its $1.60 Preferred Stock was determined to be $4.90 per share. The judgment was not appealed.

Fiat no longer owns Hesston. Because Fiat had acquired another farm equipment manufacturer, the United States Department of Justice in May 1991 required Fiat to sell all of its outstanding Hesston stock. Additional facts will be stated as is necessary to our determination of the issues raised in this appeal.

We first determine if the district court properly exercised personal jurisdiction over the nonresident shareholders. We note in passing that at oral argument before this court, dissenters did not acknowledge or address this issue in their opening argument or respond to Hesston's oral argument on this issue.

Hesston initiated this lawsuit by filing a petition pursuant to K.S.A. 17-6712 for determination of the value of its $1.60 Cumulative Convertible Preferred Stock. The caption on the petition stated: In the Matter of Hesston Corporation: (Appraisal and Determination of Value of $1.60 Cumulative Convertible Preferred Stock.) No defendants were named. In the petition, Hesston made two claims for relief. First, Hesston requested the district court to identify the stockholders ·who are entitled to valuation and payment for their shares, determine the value, and facilitate the exchange of Certificates for cash. Second, Hesston requested the district court to determine the rights of stockholders who are not entitled to valuation and payment for their shares due to their failing to comply with the requirements of K.S.A. 17-6712. In this regard, Hesston requested a declaratory judgment that the stockholders are not eligible to participate in the appraisal proceeding, that the appraisal proceeding is their exclusive remedy for valuation of their stock, and that the corporation and its directors satisfied their duties to the stockholders in approving the merger and in offering $12.50 per share.

K.S.A. 17-6712 is a mechanism providing that in certain conditions, a shareholder may require the corporation to purchase his shares at a price established under the authority of the court. Each of the 50 states has a statutory counterpart. Vestal, *The Rights of Dissenting Shareholders: Protecting the Owners Man-*

*ning Forgot*, 37 Kan. L. Rev. 349, 352 (1989). According to Vestal, "[t]he rationale behind the dissenters' rights statutes has traditionally been linked to the elimination of the common-law requirement of unanimous shareholder approval for certain fundamental corporate actions." 37 Kan. L. Rev. at 357-58. The accommodation of minority shareholders for their loss of veto power was the right to force purchase of their shares.

K.S.A. 17-6712 provides in pertinent part as follows:

"(b) The corporation surviving or resulting from any merger or consolidation, within 10 days after the effective date of the merger or consolidation, shall notify each stockholder of any corporation of this state so merging or consolidating who objected thereto in writing and whose shares either were not entitled to vote or were not voted in favor of the merger or consolidation, and *who filed such written objection with the corporation before the taking of the vote on the merger* or consolidation, that the merger or consolidation has become effective. *If any such stockholder, within 20 days after the date of mailing of the notice, shall demand in writing*, from the corporation surviving or resulting from the merger or consolidation, payment of the value of the stockholder's stock, the surviving or resulting corporation shall pay to the stockholder, within 30 days after the expiration of the period of 20 days, the value of the stockholder's stock on the effective date of the merger or consolidation, exclusive of any element of value arising from the expectation or accomplishment of the merger or consolidation.

"(c) If during a period of 30 days following the period of 20 days provided for in subsection (b), the corporation and any such stockholder fail to agree upon the value of such stock, any such stockholder, or the corporation surviving or resulting from the merger or consolidation, may demand a determination of the value of the stock *of all such stockholders* by an appraiser or appraisers to be appointed by the district court, by filing a petition with the court within four months after the expiration of the thirty-day period.

"(d) Upon the filing of any such petition by a stockholder, service of a copy thereof shall be made upon the corporation, which shall file with the clerk of the court, within 10 days after such service, a duly verified list containing the names and addresses of all stockholders who have demanded payment for their shares and with whom agreements as to the value of their shares have not been reached by the corporation. *If the petition shall be filed by the corporation*, the petition shall be accompanied by such duly verified list. *The clerk of the court shall give notice of the time and place fixed for the hearing of such petition* by registered or certified mail to the corporation and *to the stockholders shown upon the list* . . .

"(e) After the hearing on such petition the court shall determine the stockholders who have complied with the provisions of this section and

become entitled to the valuation of and payment for their shares, and shall appoint an appraiser or appraisers to determine such value. . . .

"(f) . . . The court by its decree shall determine the value of the stock of the stockholders entitled to payment therefor and shall direct the payment of such value, together with interest, if any, as hereinafter provided, to the stockholders entitled thereto by the surviving or resulting corporation. Upon payment of the judgment by the surviving or resulting corporation, the clerk of the district court shall surrender to the corporation the certificates of shares of stock held by the clerk pursuant to subsection (g). The decree may be enforced as other judgments of the district court may be enforced, whether such surviving or resulting corporation be a corporation of this state or of any other state." (Emphasis added.)

In this case, the shareholders who filed written objection with Hesston before the vote on the merger and demanded in writing after the merger the payment of the value of the stock were listed by Hesston in Exhibit E, which was attached to the petition. The stockholders listed in Exhibit E are those who had complied with the requirements of 17-6712 for participation in an appraisal proceeding. None of the defendants in the present case is listed. A second list of stockholders was attached to the petition as Exhibit G. It was titled, "Former Holders of Hesston Corporation Preferred Stock Who Previously Objected to Merger Agreement but Have Failed to Tender Shares." The stockholders listed in Exhibit G had not complied with all the requirements of 17-6712 for participation in an appraisal proceeding. Many of the defendants in this case are listed in Exhibit G. The record contains copies of a notice and summons which was sent to each of the stockholders on the second list.

Some of the stockholders listed in Exhibit G, Nicholas Halford, Latham and Joan Kays, Santa Clara Valley Corp., and Robert and Linda Parlette, responded by filing a motion to dismiss for lack of personal jurisdiction. Hesston opposed the motion. Hesston did not argue that it was not necessary for the district court to exercise personal jurisdiction over the moving defendants. Hesston stated that it filed this lawsuit to bring a final resolution to its ongoing dispute with several dissident stockholders. The district court denied the motion to dismiss. The stockholders who filed the first motion to dismiss filed an answer to the petition and their counterclaims. They reasserted the defense that the court lacked personal jurisdiction over them, and they alleged as

counterclaims that Hesston breached its contract with them and breached its fiduciary duty.

Meanwhile, the appraisal proceeding went forward. A journal entry of judgment was filed establishing the value of $1.60 Preferred Stock to be $4.90 per share and ordering the exchange of cash for the tendered stock of the five stockholders listed in Exhibit E who had participated in the appraisal proceeding. The district court ordered that this journal entry was a final judgment pursuant to K.S.A. 60-254(b).

Hesston filed a motion for default judgment against the "named defendants" whose names were listed in Exhibit G and who had been served with process. Those defendants filed with the district court a pleading announcing their intention to join in the answer and counterclaims which already had been filed by Halford, the Kayses, Santa Clara Valley Corp., and the Parlettes. Hesston withdrew its motion for default judgment. The "new" defendants filed a motion to dismiss for lack of personal jurisdiction. Hesston strenuously opposed the motion.

None of the dissenters is a resident of Kansas. In denying the second motion to dismiss for lack of personal jurisdiction, the district court likened the Certificate to a contract and concluded that jurisdiction was proper under the Kansas long arm statute, K.S.A. 1993 Supp. 60-308(b)(5). It concluded that due process requirements had been satisfied because the dissenters "have not been mere passive investors but have actively sought to involve themselves in Hesston's affairs in the State of Kansas."

This court has stated:

"The Kansas long arm statute, K.S.A. 1990 Supp. 60-308, is liberally construed to assert personal jurisdiction over nonresident defendants to the full extent permitted by the due process clause of the Fourteenth Amendment to the United States Constitution." *Anderson v. Heartland Oil & Gas, Inc.,* 249 Kan. 458, 466, 819 P.2d 1192 (1991), *cert. denied* ____ U.S. __, 118 L. Ed. 2d 551 (1992).

Thus, a two-step analysis is used in which the activities of defendants are measured by due process standards if they fall within the scope of a provision of 60-308(b).

K.S.A. 1993 Supp. 60-308 provides in pertinent part:

"(b) . . . Any person, whether or not a citizen or resident of this state, who in person or through an agent or instrumentality does any of the acts

hereinafter enumerated, thereby submits the person and, if an individual, the individual's personal representative, to the jurisdiction of the courts of this state as to any cause of action arising from the doing of any of these acts:

. . . .

"(5) entering into an express or implied contract, by mail or otherwise, with a resident of this state to be performed in whole or in part by either party in this state."

The dissenters do not seriously dispute that their conduct falls under 60-308(b)(5). Their claim for recovery of the redemption price plus accrued dividends of the $1.60 Preferred Stock is based on the Certificate's giving rise to contractual rights. Even though not retreating on their position that the Certificate is or amounts to a contract, in a footnote to their brief the dissenters suggest that at the time of the cash-out merger of the $1.60 Preferred Stock, the contract could be performed only in Illinois. The dissenters do not elaborate on this contention.

Hesston states that the dissenters did not argue in the district court that performance was not taking place in Kansas. Although the corporate offices of Hesston were moved to Illinois in 1988, Hesston argues that many corporate functions which might involve shareholders remained in Kansas after 1988. It asserts that they include the corporation's maintaining a significant manufacturing facility, holding stockholders' meetings, issuing annual reports, and making Securities Exchange Commission (SEC) filings. It is undisputed that the July 1989 shareholders' meeting at which the cash-out merger was approved was held in Kansas and the exchange account for tendered $1.60 Preferred Stock was established in a bank in Kansas. From this meager record it does not appear that the contract between Hesston and the dissenting shareholders could be performed only in Illinois. Thus, the district court's conclusion seems to be correct that under K.S.A. 1993 Supp. 60-308(b)(5), the dissenters submitted to the jurisdiction of the courts of this state as to a cause of action arising from their entering into contracts with Hesston to be performed at least in part in Kansas.

As to the nature and quality of the dissenters' activities, the district court concluded that they had engaged in conduct

"which was reasonably likely to bring them into conflict with Hesston Corporation, and therefore to subject them to litigation in the State of Kansas.

These activities include: utilization of defendant L.G. Kays as a common agent for the purpose of purchasing stock for virtually all of the shareholders, as well as the use of Kays by the shareholders as an agent in negotiations with Hesston Corporation. Additionally, ten of the thirteen defendants joined a 'Preferred Shareholders Protective Committee' and signed a Shareholder Agreement to give other members of the committee a right of first refusal to purchase their preferred stock. The clear purpose of this action was to implement their objections to the 1989 merger agreement, and which is the crux of the dispute between the shareholders and Hesston Corporation in this action. The same shareholders also participated in the Allied Corporation litigation which preceded this suit. The same or nearly the same issues were raised in the Allied litigation as in this suit, and since the stockholder defendants at issue utilized a common Chicago law firm to help protect their interests in the Allied litigation in Kansas courts, it is fair to conclude that they have not been mere passive investors but have actively sought to involve themselves in Hesston's affairs in the State of Kansas."

The district court made the following findings of fact which relate to the dissenters' role in the Allied litigation and the formation and operation of the "Preferred Shareholders Protective Committee":

"45. . . . After receiving an express threat of litigation from Allied, . . . [Hesston] file[d] suit against Allied in federal district court in Wichita, Kansas. *Hesston Corporation v. Allied Products Corporation, et al.*, Civil Action No. 87-1266-C. On May 20, 1987, Allied also filed a lawsuit in federal court against Hesston claiming to represent a class of all Hesston $1.60 Preferred Stockholders and claiming they were entitled to the $25.00 redemption price plus all accrued dividends. Those two lawsuits were consolidated.

"46. Shortly after Allied announced to the press that they would be contesting the 1987 Merger Agreement, Kays contacted Allied's attorney . . . and requested that [the attorney] and his law firm . . . represent his interests and the interests of his clients and various other Hesston $1.60 Preferred Stockholders with whom he had been in contact.

"47. Throughout 1987, Kays continued to make demands against Hesston. . . . In the latter part of 1987 and 1988, defendants Kays, Parlette and Swenson agreed to jointly hire an attorney in Kansas for the purposes of obtaining a copy of the Hesston stockholders list.

"48. In early February, defendant Kays and Allied formed a committee of $1.60 Preferred Stockholders known as the Preferred Shareholders Protective Committee (the 'Committee') with the objective of blocking Fiat from obtaining ownership or control of ⅔ of the $1.60 Preferred Stock. The Committee sent a notice to all $1.60 Preferred Stockholders soliciting participation in the Committee and the sharing of information by writing to the Committee in care of defendant Kays.

"49. In early March, 1988, a group of Hesston $1.60 Preferred Stock-holders, including defendant Kays, issued a press release announcing that they would seek to join as plaintiffs in the class action filed by Allied against Hesston and Fiat.

"50. On May 20, 1988, Hesston was allowed leave to amend its federal court action against Allied in Wichita, Kansas to add Kays and numerous other stockholders as defendants. The additional defendants were commonly referred to as the 'Kays Group.' Among other claims, Hesston sought declaratory judgment against the Kays Group declaring that Hesston and its Board of Directors had discharged all their duties to said stockholders in the consideration, recommendation and approval of the Merger Agreement in 1987.

. . . .

"53. On March 28, 1989, an Order of Dismissal With Prejudice was filed in the class action brought by Allied and . . . in the action brought by Hesston against Allied and the Kays Group. The Kays Group's attorneys approved said dismissal with prejudice."

In the present case, it appears that the dissenters' motion to dismiss for lack of jurisdiction was decided on the basis of written materials. Among the district court's prefatory remarks is the following: "Prior to making these orders, the Court has carefully studied the submissions of the parties, and conducted an extensive review of the pertinent cases." Examination of the index to the record on appeal does not reveal a transcript for an evidentiary hearing on the question of personal jurisdiction. It appears that the question of personal jurisdiction was decided by the district court on the basis of the parties' written submissions.

In *Rambo v. American Southern Ins. Co.*, 839 F.2d 1415, 1417 (10th Cir. 1988), a case cited by the dissenters, the Tenth Circuit Court of Appeals explained appellate review of personal jurisdiction questions:

" 'The plaintiff bears the burden of establishing personal jurisdiction over the defendant. Prior to trial, however, when a motion to dismiss for lack of jurisdiction is decided on the basis of affidavits and other written materials, the plaintiff need only make a prima facie showing. The allegations in the complaint must be taken as true to the extent they are uncontroverted by the defendant's affidavits. If the parties present conflicting affidavits, all factual disputes are resolved in the plaintiff's favor, and the plaintiff's prima facie showing is sufficient notwithstanding the contrary presentation by the moving party.' [Citations omitted.] We review a district court's ruling on a jurisdictional question de novo. [Citation omitted.] Thus, our task is to determine whether the plaintiffs' allegations, as supported by affidavits, make

a prima facie showing of the minimum contacts necessary to establish jurisdiction over each defendant."

There are a few plain factual differences in the submissions of the parties, but their positions differ most significantly in what inferences they advocate should be drawn from the written materials.

Hesston responded to the first motion to dismiss for lack of personal jurisdiction with copies of letters to Hesston and its counsel from Latham Kays and Robert Parlette complaining of corporate activities and seeking means of taking a more active role in decision making, including requesting the shareholder list. The correspondence began in 1987. Also supplied by Hesston were letters written by Halford, Latham and Joan Kays, Robert Parlette, and Molly Swenson on behalf of Santa Clara Valley Corp., objecting to the 1989 merger. An affidavit of Richard Hrdlicka, General Counsel, Senior Vice President and Secretary of Hesston, states that Allied filed with the SEC a Schedule 13D, Amendment No. 2 form which disclosed that Allied had formed a committee of Preferred Stockholders known as the Preferred Shareholders Protective Committee. Hrdlicka also stated that Allied had entered into an agreement with numerous other Preferred Stockholders known as an "Agreement Among Holders of $1.60 Cumulative Convertible Preferred Stock of Hesston." Hrdlicka stated that Hesston brought Latham Kays, C.B. and Molly Swenson, and Green Valley Corp. Profit Sharing Trust into *Allied* as additional defendants, that they were represented by Kansas counsel, and that they did not raise the question of personal jurisdiction.

In a letter opinion, the district court advised the parties that it was denying the motion to dismiss which had been filed by Halford, the Kayses, Santa Clara Valley Corp., and the Parlettes. The district court stated that they are not merely passive investors who happened to purchase the preferred stock, they had extensive contacts with corporate management, and they attempted to organize into a protective committee. The district court also stated that at least some of these individuals have voluntarily participated in *Allied* without objecting to the jurisdiction.

The letter opinion was followed by the filing of a motion to dismiss for lack of personal jurisdiction by the remaining defen-

dants. The position of these defendants was that the reasons given by the district court for exercising jurisdiction over Halford, the Kayses, Santa Clara Valley Corp., and the Parlettes did not apply to them. They assert that they did not have extensive contacts with corporate management and did not voluntarily participate in *Allied.*

Hesston submitted answers to interrogatories to establish that Barry Swenson controls the shares of stock which are "beneficially owned" by Green Valley Corp. and Salinas Valley Corp. Hesston submitted an Hrdlicka affidavit stating that Hesston believed that Latham Kays was the leader of a group of dissident stockholders, but that Hesston was not able to fully determine the identity of all stockholders working with Kays. Hesston also attached to its response photocopies of letters sent to Hesston objecting to the 1989 merger. Except for Salinas Valley Corp., Green Valley Corp., Barry and Molly Swenson (as individuals), and F.X. Fitzpatrick, the record contains objections from the dissenters either in the same form as the letter sent by the Kayses or in some other form.

The dissenters state that none of the movants participated in the Allied Products litigation or joined the preferred shareholders' protective committee. They did not provide a sworn statement or statements, but they did append a photocopy of a pleading from *Allied*, which lists a number of defendants. The names familiar from the present case are L.G. Kays, F.X. Fitzpatrick, C.B. Swenson and Swenson for Green Valley Corp. Profit Sharing Trust, and Molly Swenson.

With respect to Committee membership, Hesston provided copies of an "Agreement Among Holders of $1.60 Cumulative Convertible Preferred Stock of Hesston Corporation," which had been signed by:
Alfred and Blanche Anna
James and Janice Brooks
Norman Guittar and Guittar as trustee
John Hutson
Jay Johnson
John and Barbara Meyer
Eleanore Kirchmer
Roy and Margaret Partenheimer

George and Leonora Schodroski

Russell and Jean Siebert

By signing, the shareholders agreed to become members of a Preferred Shareholders Protective Committee and to give other Committee members a right of first refusal on their $1.60 Preferred Stock.

The agreement also requested members to contribute 2¢ per share to the Committee, in care of Latham Kays, to defray mailing expenses. Hesston's theory is that Kays was agent for these shareholders and that an agent's contacts with the forum state suffice for the purpose of imposing personal jurisdiction on the principals.

Attached to the dissenters' reply are deposition excerpts, which are offered to controvert Hesston's assertion that Kays was the dissenters' implied or expressed agent. Latham Kays is a stockbroker, and some of the dissenters bought their $1.60 Preferred Stock on his advice. Kays testified that he was their

"registered representative. I had suggested and recommended the stock to them, and I felt an obligation, at least a moral obligation, to have their stock work out as well as I thought it should for both their interest and my own, and I was trying to work to our mutual interest."

The dissenters also deny that Kays was acting on their authorization or behalf in his various activities, including hiring counsel.

Hesston relies principally on *American Greetings Corp. v. Cohn*, 839 F.2d 1164, 1165 (6th Cir. 1988), which shares with the present case "a somewhat unusual fact setting." In *American Greetings*, the corporation sued a nonresident shareholder, seeking a declaration that an amendment to the articles of incorporation was valid. The suit followed Cohn's threat to sue for a declaration of invalidity. What is unusual about the fact setting is that the corporation sued a shareholder in the corporation's state of incorporation. Thus, the challenge to the court's jurisdiction over the defendant required examination of the shareholder's rather than the corporation's connections with the forum state.

Cohn was a resident of California. He formerly lived in Ohio and was admitted to the Ohio bar but never practiced there. He owned a large number of shares in American Greetings. After an amendment to the articles of incorporation, which he did not vote for or against, he began to make his opposition to the amend-

ment known to the corporation and to insist that it be rescinded. During the nine months from August 1985 to April 1986, "[Cohn] contacted the [corporation] on numerous occasions in writing, by telephone, through an Ohio lawyer, and through his brother, who lived in Ohio." 839 F.2d at 1165. In May 1986, American Greetings filed its declaratory judgment action. The district court dismissed the complaint for lack of personal jurisdiction on the dual grounds that Cohn's contacts with Ohio satisfied neither the State's long arm statute nor due process requirements. 839 F.2d at 1166.

The Sixth Circuit Court of Appeals reversed. The pertinent provision of Ohio's long arm statute stated: " '(A) A court may exercise personal jurisdiction over a person who acts directly or by an agent, as to a cause of action arising from the person's: (1) Transacting any business in this state.' " 839 F.2d at 1167 (quoting Ohio Rev. Code Ann. § 2307.382 [1991]). This provision is comparable to K.S.A. 1993 Supp. 60-308(b)(1). As with Kansas' long arm statute, the Ohio statute " 'has been construed to extend to the outer limits of due process' " so that the analysis becomes one of " 'constitutional limitations.' " 839 F.2d at 1167 (quoting *R. L. Lipton Distributing Co. v. Dribeck Importers, Inc.*, 811 F.2d 967, 969 [6th Cir. 1987]).

The Sixth Circuit Court of Appeals, like the Tenth Circuit in *Rambo*, requires a plaintiff to make only a prima facie case of jurisdiction when the issue is decided by the district court on written submissions. 839 F.2d at 1168-69.

Three personal jurisdiction cases which have been decided by the United States Supreme Court within the last decade were considered by the Sixth Circuit Court of Appeals to offer particular guidance. In *Helicopteros Nacionales de Colombia v. Hall*, 466 U.S. 408, 80 L. Ed. 2d 404, 104 S. Ct. 1868 (1984), the Supreme Court distinguished between specific and general jurisdiction. "Specific jurisdiction" is exercised over a defendant whose contacts with the forum state give rise to the suit; "general jurisdiction" is exercised over a defendant in a suit which does not arise out of or relate to the defendant's contacts with the forum state. 839 F.2d at 1167.

"When the cause of action is related to or arises out of a defendant's contacts with the forum, *in personam* jurisdiction must be founded on a 'relationship

among the defendant, the forum, and the litigation.' [466 U.S.] at 414, 104 S. Ct. at 1872 (quoting *Shaffer v. Heitner*, 433 U.S. 186, 204, 97 S. Ct. 2569, 2580, 53 L. Ed. 2d 683 (1977))." 839 F.2d at 1167.

In *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474, 85 L. Ed. 2d 528, 105 S. Ct. 2174 (1985), the Supreme Court reiterated that the "constitutional touchstone" is the defendant's purposefully acting to establish contacts with the forum state.

"The Court stated that once it is determined that the defendant's purposeful acts caused minimum contacts with the forum state, these contacts 'may be considered in light of other factors'; *i.e.*, the burden on the defendant, the forum's interest, the plaintiff's interest, and the interest of the interstate judicial system. [471 U.S.] at 476-77, 105 S. Ct. at 2184." 839 F.2d at 1168.

In *Asahi Metal Industry Co. v. Superior Court*, 480 U.S. 102, 94 L. Ed. 2d 92, 107 S. Ct. 1026 (1987), the Court concluded that it was a violation of due process for California to exercise personal jurisdiction over a Japanese manufacturer of a valve which had been incorporated by a Taiwanese company into a tire marketed in the United States. When the Taiwanese company was sued in tort in California, it filed a cross-complaint against Asahi, seeking indemnification. The California court exercised jurisdiction on the ground that Asahi acted intentionally by placing its product in the stream of international commerce. The Supreme Court concluded that the State's exercise of jurisdiction was unreasonable and unfair in that the burden on Asahi greatly outweighed the interests of the defendant tire company and the forum state in subjecting the Japanese company to jurisdiction.

The Sixth Circuit Court of Appeals noted that *American Greetings*, like *Burger King*, was a specific jurisdiction case. 839 F.2d at 1169. In the present case, the dissenters fault the district court for failing to decide whether this was a case of specific or general jurisdiction. In *Helicopteros*, it was not argued that the claims against the foreign company arose from or were related to its activities in the forum state. 466 U.S. at 414. Thus, the State was said to be exercising "general jurisdiction," and the company's contacts with the forum state were examined for "continuous and systematic general business contacts." 466 U.S. at 416. In the present case, Hesston argues that its claims against the dissenting shareholders arise out of and are related to their entering into a

contract which was to be performed at least in part in Kansas and their opposing the corporate restructuring. The dissenters deny the substance but not the defining scope of Hesston's contentions. Thus, it appears that the present case should be analyzed as a matter of "specific jurisdiction."

Mindful of the "constitutional touchstone," the Sixth Circuit Court stated that "[s]atisfaction of the 'purposeful availment' requirement ensures that a defendant will not be 'haled into a jurisdiction' with which he has no substantial connection or where his activities would not lead one reasonably to believe that he was subjecting himself to the processes of the jurisdiction. [*Burger King*, 471 U.S. at 475.]" 839 F.2d at 1169. In an opinion the dissenters in the present case rely on, *Kansas Turnpike Authority v. Wheeler*, 243 Kan. 602, 616, 760 P.2d 1213 (1988), this court quoted extensively from *Burger King* for the proposition that "due process requires a demonstration that the nonresident defendant purposely established minimum contacts with the forum state, thereby invoking the benefits and protections of its law."

The facts of *American Greetings* did not fit any of the typical patterns of personal jurisdiction cases. The Sixth Circuit court, therefore, looked for features in *American Greetings* "that are analogous to those in the more common cases." 839 F.2d at 1169. With regard to Cohn's activities, the court stated:

"It is clear to us that Cohn himself originated and maintained the required contacts with Ohio by his letters and telephone calls to American Greetings and by designating his brother, an Ohio resident, and an Ohio attorney to pursue his claims with American Greetings in Ohio. In these contacts Cohn did much more than argue that the amendment to the plaintiff's articles was illegal. He threatened to sue American Greetings and sought a substantial sum of money to forego his claim. In view of these undisputed facts, we find the district court's description of Cohn's position in the litigation as 'mere ownership of stock in an Ohio company and the expression of strong reservations concerning the legality of a matter of legitimate shareholder interest' to be inaccurate." 839 F.2d at 1170.

Satisfied that Cohn's purposeful acts created a substantial connection with Ohio, the court examined "the factors that determine reasonableness"—the burden on defendant and the interests of plaintiff, forum, and interstate judicial system. 839 F.2d at 1170. It concluded that the burden on Cohn was not unduly heavy in that he was represented by Ohio counsel who pressed Cohn's

claims against the corporation well before suit was filed. American Greetings was said to have "a strong interest in the availability of a convenient forum for resolution of a dispute that had the possibility of affecting its relations with all its shareholders." 839 F.2d at 1170. Ohio was said to have "a strong interest in providing a forum for the adjudication of issues pertaining to the legality under Ohio law of the acts of an Ohio corporation." 839 F.2d at 1170. Finally, the court concluded that the interest of the interstate judicial system was not implicated. Thus, the strong interests of the corporation and the State outweigh the manageable burden on Cohn, and the court found that Cohn had failed to present any considerations which would render the exercise of personal jurisdiction unreasonable. 839 F.2d at 1170.

*American Greetings* is uniquely helpful in the present case in that that court undertook an examination of the activities of a *shareholder* defendant.

This case involves a number of shareholder defendants who engaged in widely varying degrees of active opposition to Hesston's merger. Contacts personally made by shareholders with Hesston are shown for the most part by letters sent in July 1989 objecting to the 1989 merger. It does not appear from the record that an objection was sent by Green Valley Corp., Salinas Valley Corp., Barry Swenson, F.X. Fitzpatrick, or John and Judith Llewellyn. Molly Swenson objected on behalf of Santa Clara Valley Corporation, but not as an individual. In *Anderson v. Heartland Oil & Gas, Inc.*, 249 Kan. 458, 467, 819 P.2d 1192 (1991), *cert. denied* ___ U.S. ___, 118 L. Ed. 2d 551 (1992). this court stated: "[R]esidents of one state, by becoming stockholders of a corporation incorporated under the laws of another state, submit themselves to that extent to the jurisdiction and laws of the latter state. See 36 Am. Jur. 2d, Foreign Corporations § 431 and cases cited therein." The statement was unnecessary to the holding in that case and does not reflect current law.

The personal jurisdictional question in *Anderson* centered on defendants Jones and Young, who were nonresident directors and officers of the defendant Kansas corporation. Jones and Young claimed that the court lacked personal jurisdiction over them, but this court disagreed. It stated: "Jurisdiction over individual officers, directors and employees of a domestic corporation, for

claims that may result in personal liability, is predicated merely upon jurisdiction over the corporation itself." 249 Kan. at 468.

Hence, the court's statement about nonresidents submitting themselves to jurisdiction in the state merely by purchasing stock is gratuitous. The statement is drawn directly from § 433, not § 431, of the Am. Jur. 2d discourse on foreign corporations. The United States Supreme Court cases cited in § 433 antedate *Internat. Shoe Co. v. Washington*, 326 U.S. 310, 90 L. Ed. 95, 66 S. Ct. 154 (1945), the opinion generally considered to mark a shift in judicial attitude toward jurisdictional power. In *Internat. Shoe*, the formulation that minimum contacts must constitute the fair play and substantial justice of due process was applied.

The dissenters point out that the dicta of *Anderson* is directly contradicted in *Shaffer v. Heitner*, 433 U.S. 186, 53 L. Ed. 2d 683, 97 S. Ct. 2569 (1977). There, the Supreme Court decided that nonresident officers and directors of a Delaware corporation were not subject to suit in Delaware despite their positions with a domestic corporation and their ownership of its stock. The Supreme Court stated that it had not been demonstrated

"that appellants have 'purposefully avail[ed themselves] of the privilege of conducting activities within the forum State,' *Hanson v. Denckla, supra,* at 253, in a way that would justify bringing them before a Delaware tribunal. Appellants have simply had nothing to do with the State of Delaware. Moreover, appellants had no reason to expect to be haled before a Delaware court. Delaware, unlike some States, has not enacted a statute that treats acceptance of a directorship as consent to jurisdiction in the State. And '[i]t strains reason . . . to suggest that anyone buying securities in a corporation formed in Delaware "impliedly consents" to subject himself to Delaware's . . . jurisdiction on any cause of action.' Folk & Moyer, [73 Colum. L. Rev. 749] n.10, at 785. Appellants, who were not required to acquire interests in Greyhound in order to hold their positions, did not by acquiring those interests surrender their right to be brought to judgment only in States with which they had had 'minimum contacts.'" 433 U.S. at 216.

It may also be noted that the jurisdiction asserted was characterized by the Delaware court as being quasi in rem because it was founded on the statutory presence in Delaware of stock owned by the individual defendants. The Supreme Court rejected the argument that the jurisdiction, therefore, was not subject to the analysis developed in in personam cases. The Court "conclude[d] that all assertions of state-court jurisdiction must be

evaluated according to the standards set forth in *International Shoe* and its progeny." 433 U.S. at 212.

In the present case, the provision of the long arm statute which has been applied involves a contract because the Certificate issued to stock purchasers sets out the terms of an agreement between them and the corporation. As with the purchase of stock, an individual's contract with an out-of-state party does not alone establish sufficient minimum contacts in the other party's home forum to support the exercise of personal jurisdiction. *Burger King,* 471 U.S. at 478.

At the urging of Hesston, the district court singled out the contract subsection of the long arm statute as applying to the dissenters. The contract in question is the Certificate for $1.60 Preferred Stock. The second step of the analysis, examination of the nature and quality of the dissenters' contacts with Kansas, may be broader in scope than an inquiry solely into the terms of the contract. See 471 U.S. at 479. Thus, for those defendants who sent written objection to the 1989 merger to Hesston, the district court's exercise of jurisdiction was based at least in part on those letters. The question is whether the dissenters' fulfill-ment of a statutory prerequisite to participation in the appraisal proceeding, as directed in Hesston's notice, is the kind of "pur-poseful availment" of the benefits of interstate activities which satisfies due process requirements. We conclude that it does. By objecting, each defendant " 'purposefully avail[ed] itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.' " 471 U.S at 475 (quoting *Hanson v. Denckla,* 357 U.S. 235, 253, 2 L. Ed. 2d 1283, 78 S. Ct. 1228 [1958]). By objecting, the dissenters took a step toward preserving the right to participate in the statutory appraisal proceeding, which in some instances may protect the rights of minority shareholders. In the particular circumstances of this case, the statutory proceeding has been wielded by the corporation more as a sword than as a shield, but at the time the dissenters were objecting it is likely that they were hoping to use it to their advantage.

The dissenters cite *Nicholas v. Buchanan,* 806 F.2d 305 (1st Cir. 1986), *cert. denied* 481 U.S. 1071 (1987), for the proposition that the use of interstate mail and telephone will not suffice

without more to satisfy due process. In that case, the First Circuit Court of Appeals collected a number of federal cases which support the proposition. 806 F.2d at 307-08. Here, the objecting letters sent by dissenters were a means of preserving their statutory rights rather than as garden-variety mail at issue in the federal cases.

In addition to sending a written objection, some of the dissenters signed an agreement by which they agreed to form the shareholders' Committee and to refrain from selling their shares to Fiat. On this matter, Hesston furnished an affidavit stating that Allied claimed to have formed the Committee and that Allied had entered into the agreement with the other stockholders. The agreement itself does not seem to involve contact with Kansas or with Hesston, the Kansas corporation. The agreement, however, formalized an alliance of stockholders involved in the *Allied* litigation in Kansas, or at least some subgroup of the alliance of stockholders was involved. The district court found that when Allied's offer to purchase Hesston was rebuffed, Allied threatened to sue. Hesston beat Allied to the courthouse, but Allied later filed a suit against Hesston in which Allied claimed to represent a class of owners of $1.60 Preferred Stock. The two suits were consolidated, and Hesston amended its complaint to add individual shareholders as named defendants. With regard to the timing of these events, the district court found that Allied's complaint was filed in May 1987 and that Hesston was allowed leave to amend in May 1988. In 1987, Kays, in particular, made demands of Hesston, he requested that Allied's attorney represent his interests and the interests of other dissenters, and he and Allied formed the Committee.

The district court viewed the agreement as a significant activity for the purpose of determining contacts with Kansas. The district court stated that its clear purpose was to implement the dissenters' objections to the 1989 merger. The district court also viewed the Committee members' participation in the *Allied* litigation as a significant activity for the purpose of determining contacts with Kansas. There does not seem to have been a certification of a class in that action, nor does it seem that the individual dissenters were named in the action other than by Hesston when it amended to add some individuals as defendants.

The district court viewed the dissenters' involvement as self-initiated contacts, nonetheless, on the ground that they engaged in activities which they should have anticipated would bring them into conflict with Hesston on the issues being litigated at that time in the federal court in Kansas. Thus, they should have anticipated being haled into court in Kansas.

In *American Greetings*, the appellate court viewed Cohn's threatening suit and seeking a substantial sum of money to forego his claim as having been inaccurately described by the trial court as "the expression of strong reservations concerning the legality of a matter of legitimate shareholder interest." 839 F.2d at 1170. The appellate court concluded that Cohn had removed himself from the category of passive investor and placed himself squarely in a position of satisfying the requirements of minimum contacts and purposeful availment. 839 F.2d at 1170.

This court, too, has had occasion to compare the roles of passive investors with those of investors who purposely availed themselves of the benefits of Kansas law. In *Kansas Turnpike Authority v. Wheeler*, 243 Kan. at 616-18, the court concluded that the district court properly exercised personal jurisdiction over nonresident purchasers of turnpike revenue bonds. According to the district court's memorandum decision, the " 'bonds were issued by a governmental entity of the State of Kansas and were secured by a lien on revenues to be generated from assets located in Kansas.' " 243 Kan. at 617. The record showed that one defendant regularly telephoned Kansas Turnpike Authority (KTA) officers for information relating to the bonds, the other defendant wrote to KTA, and both requested records from KTA and inspected documents in Kansas. 243 Kan. at 617. In these circumstances, the court's assertion of personal jurisdiction over the bondholders was held to be consistent with the due process limitation on state power.

In the present case, the district court was justified in concluding that the documented activities of at least some of the dissenters resulted in their having significant contacts with this state. Latham Kays and Robert Parlette, in particular, actively sought to prevent Fiat's takeover. For those dissenters whose documented activities are limited to signing the agreement and/or writing to object to the merger, the contacts are certainly less obvious. Hesston ar-

gues that their activities were carried out through the agency of Kays. His presence behind the activities may be detected in his contacting Allied, Allied's advising the SEC that it had formed the Committee, and many of the objecting letters being identical to the letter sent by Kays. Hesston also contends that Kays was acting on behalf of the other dissenters when he threatened litigation and made demands of Hesston, but the record is weak on this point. Hesston furnished photocopies of letters written by Kays in which he claimed to be writing on behalf of other stockholders as well as himself, but his authorization to do so is missing. Hesston also argues that the timing of the dissenters' purchases of stock, *i.e.*, after Fiat's tender offer, demonstrates that they were aggressive and contentious investors. The district court found that many of the dissenters purchased their stock from Kays after January 1987, but precisely which stockholders purchased when is not set out in the district court's opinion.

The dissenters have not presented any reason why general principles of agency should not apply in the context of personal jurisdiction. The Kansas long arm statute expressly provides that the actions of an agent may constitute submission to the jurisdiction of the courts of this state. In *American Greetings*, Cohn's contacts with Ohio were in part conducted through his agent. In *Burger King*, the Supreme Court noted that the Eleventh Circuit Court of Appeals held that one joint franchise owner's physical presence in the forum state was irrelevant to the question of the other joint franchise owner's minimum contacts with that forum. 471 U.S. at 479 n.22. The Supreme Court did not find it necessary to "resolve the permissible bounds of such attribution," but it did suggest that the holding was too narrow:

"We have previously noted that when commercial activities are 'carried on in behalf of' an out-of-state party those activities may sometimes be ascribed to the party, *International Shoe Co. v. Washington*, 326 U.S. 310, 320 (1945), at least where he is a 'primary participan[t]' in the enterprise and has acted purposefully in directing those activities, *Calder v. Jones*, 465 U.S. at 790." 471 U.S. at 479 n.22.

The defendants in *Calder v. Jones*, 465 U.S. 783, 79 L. Ed. 2d 804, 104 S. Ct. 1482 (1984), are reporter and editor, respectively, with the National Enquirer. Neither resided in the forum state,

California, but the publication was circulated there. The Supreme Court stated:

"Petitioners are correct that their contacts with California are not to be judged according to their employer's activities there. On the other hand, their status as employees does not somehow insulate them from jurisdiction. Each defendant's contacts with the forum State must be assessed individually. See *Rush v. Savchuk*, [444 U.S. 320] at 332 ('The requirements of *International Shoe* . . . must be met as to each defendant over whom a state court exercises jurisdiction'). In this case, petitioners are primary participants in an alleged wrongdoing intentionally directed at a California resident, and jurisdiction over them is proper on that basis." 465 U.S. at 790.

What the dissenters have argued to this court is that there is no express agency. They contend that, if an agency existed at all, it is an implied agency so tenuous that it would offend "traditional notions of fair play and substantial justice" to force the stockholders to defend this action in Kansas. They refer to the "unwitting creation of an agency."

There is some merit in dissenters' characterization of the alleged agency relationship; however, we do not rely on agency as a significant or even controlling factor in our determination of this issue. The record contains signed agreements, objecting letters, and answers to interrogatories, which serve to demonstrate the efforts of dissenters to intervene in the corporation's course of action.

We conclude that the district court correctly determined that the dissenters submitted themselves to the jurisdiction of the courts of this state under the long arm statute, K.S.A. 1993 Supp. 60-308(b)(5), by entering into a contract with Hesston and that Hesston made a prima facie showing of the minimum contacts necessary to establish jurisdiction over those dissenters who corresponded with the corporation, threatened litigation, demanded information, agreed to work together to prevent Fiat's takeover, and/or objected to the 1989 merger. The record contains evidence of at least one of these contacts or activities for each of the dissenters. Finally, the burden on the dissenters and the interests of Kansas, Hesston, and the interstate judicial system should be considered. The dissenters are represented by able Kansas counsel, and their association seems to date from before the initiation of this lawsuit. Also of record as counsel for the dissenters is a

firm from the State of Washington. The dissenters, or at least some dissenters, filed a related suit in Washington. It is stayed pending the resolution of the present proceedings. The dissenters are scattered throughout the United States, their Washington counsel has entered an appearance in Kansas, and no reason has been given why it would be more convenient for the non-Washington residents to litigate there than here. Hesston is represented here by Kansas counsel with whom it has a longstanding relationship. Kansas law governs the dispute, and Kansas has a keen interest in resolving the once-prominent Kansas corporation's differences with its stockholders. Thus, we find that the balance tips in favor of the exercise of personal jurisdiction in Kansas.

We next consider if any of the dissenters were barred from pressing claims against Hesston because their shares were surrendered or because they previously participated in litigation against Hesston. The district court ruled that Jay Johnson, Green Valley Corp., Salinas Valley Corp., Santa Clara Valley Corp., Barry and Molly Swenson, and F.X. Fitzpatrick (tendering shareholders) were barred from pressing their claims against Hesston because their shares had been tendered to the bank which maintained the exchange account. The shares were held in a "street name" and were tendered by the brokerage firm(s). The tendering shareholders received $12.50 per share in exchange for their certificates.

The tendering shareholders argue that the issue is one of waiver and contend that they did not waive their rights to press claims against Hesston. They rely on the well-known principle that a waiver is the intentional relinquishment of a known right. *Prather v. Colorado Oil & Gas Corp.*, 218 Kan. 111, 117, 542 P.2d 297 (1975); *Jones v. Jones*, 215 Kan. 102, 116, 523 P.2d 743, *cert. denied* 419 U.S. 1032 (1974). They argue that they did not know until after the shares had been tendered and value received in exchange that the action was being undertaken by the brokerage firm(s). In other words, they did not intend to relinquish their rights to withhold their shares.

Hesston responds that the issue is the legal effect of a transaction carried out by a fiduciary. Hesston's position is that the principles of waiver are not involved because the brokerage firm(s)

acted as fiduciaries for the tendering shareholders and that the exchange bank which had been designated by Hesston was entitled as a matter of law to assume that the fiduciaries were acting within their authority. The district court correctly agreed with Hesston.

Hesston relies on *Sornberger v. Chesapeake & Ohio*, 81 Md. App. 14, 566 A.2d 503 (1989), *cert. denied* 319 Md. 72 (1990), for the proposition that the erroneous surrender of shares by the shareholders' nominee(s) precludes the shareholders from pursuing claims against the corporation. In that case, as in the present case, securities companies were the registered owners of some shares which were beneficially owned by individuals. Pursuant to a statutory notice of an impending merger and an offer of a liquidated amount for shares, securities companies surrendered the shares of some individuals and received payment for them. Attempts to repudiate the surrenders were refused by the corporation. The court upheld the corporation's action and dismissed the claims which had been filed by the beneficial owners in the statutory appraisal proceeding.

The beneficial owners' attempts were made pursuant to the Maryland appraisal statute, which provides for participation of "an objecting stockholder *who has not received payment* for his stock." 81 Md. App. at 21 (quoting Md. Corps. & Ass'ns Code Ann. § 3-208 [1985]). The court rejected the argument that the statute should be interpreted to mean a stockholder who has not " 'accepted or retained payment' " on the ground that Maryland case law requires that the statute be strictly construed. 81 Md. App. at 21. As an additional reason for excluding the beneficial owners, the court stated that the legal efficacy it accorded the fiduciary transfers was codified in Maryland under the Uniform Act for the Simplification of Fiduciary Security Transfers. The same provision has been adopted in Kansas as K.S.A. 17-4905, which provides:

"Except as otherwise provided in this act, a corporation or transfer agent making a transfer of a security pursuant to an assignment by a fiduciary:

(a) May assume without inquiry that the assignment, even though to the fiduciary himself or to his nominee, is within his authority and capacity and is not in breach of his fiduciary duties;

(b) May assume without inquiry that the fiduciary has complied with any controlling instrument and with the law of the jurisdiction governing the

fiduciary relationship, including any law requiring the fiduciary to obtain court approval of the transfer; and

(c) It is not charged with notice of and is not bound to obtain or examine any court record or any recorded or unrecorded document relating to the fiduciary relationship or the assignment, even though the record or document is in its possession."

With respect to the Maryland counterpart, the Court of Special Appeals of that state made the following observations:

"This provision plainly states that it is not a corporation's duty, when accepting a transfer from a fiduciary, to verify that transfer with the principal. Such a requirement would not only be burdensome, but also it would defeat the whole purpose of a fiduciary relationship. Since the fiduciary is a representative of the principal's interests in the transaction, the corporation is entitled to rely on the representations made by the fiduciary notwithstanding previous contrary indications by the principal. This court cannot impose a duty on the corporation which is wholly inconsistent with the [legislature's] stated intent." 81 Md. App. at 22.

The Maryland court concluded that the corporation had fulfilled its duty and that the beneficial owners of the shares "may not be heard to complain now for their fiduciaries' errors." 81 Md. App. at 23. We agree with the conclusion of the Maryland court. Although the decision of the Court of Special Appeals of Maryland is not controlling, it is persuasive.

Here, the tendering shareholders contend that *Sornberger* is distinguishable on the ground that its holding should be confined to a shareholder's pursuit of appraisal rights. They concede that statutory appraisal rights are conditioned on retention of the stock, but argue that the requirement of ownership does not apply to their common-law claims against Hesston. They cite no authority for their position. If their argument were accepted, there would be no finality to shareholders' quarrels with corporate operations. Shareholders could tender their shares, accept the cash benefit of the transaction, and ask the courts to referee in the hope that their gain would be increased.

K.S.A. 17-4905 controls; therefore, the district court's dismissal of the claims of Jay Johnson, Green Valley Corp., Salinas Valley Corp., Santa Clara Valley Corp., Barry and Molly Swenson, and F.X. Fitzpatrick in their entirety was proper. The district court's dismissal of the claims of John Meyer, Nicholas Halford, John

Hemmer, and Robert Parlette to the extent their shares were surrendered was proper.

The dissenters also complain that the trial court concluded that all the stockholders were barred by the preclusive doctrines of collateral estoppel and *res judicata* from pursuing claims in this case. The district court's conclusion of law ¶ 39 states: "Defendant stockholders are barred from challenging the fairness of the 1987 Merger Agreement by the doctrines of res judicata and collateral estoppel since they were either defendants in the *Allied* litigation, or privies to parties therein, and all claims regarding the 1987 Merger Agreement were dismissed with prejudice."

Hesston correctly points out that there are no claims relating to the 1987 transaction in the present case. Even if there were, the dissenters' claims would have been barred under the district court's alternative conclusion that claims relating to the 1987 merger are barred by the two-year statute of limitations. As Hesston further points out, the dissenters did not raise the statute of limitations as an issue on appeal. In any event, the district court still considered any claims made by the dissenters with respect to the 1987 merger and concluded that they had no merit.

The dissenters argue that the statutory appraisal proceeding provided for shareholders aggrieved by a cash-out merger is not their exclusive remedy. They, however, fail to identify a ruling by the district court which was adverse to their position.

The district court concluded, as a matter of law, that "[a] statutory appraisal proceeding is the exclusive remedy available to dissenting stockholders *to contest the value of stock* in a cash out merger." (Emphasis added.) The district court did not conclude that dissenters' claims of breach of contract and breach of fiduciary duty involved contesting the value of the stock or that dissenters were barred from pursuing those common-law claims. It appears that the district court considered the breach of contract and breach of fiduciary duty claims made by the dissenters to be separate and independent from the statutory appraisal procedure.

Dissenters next argue that the district court erred in concluding that there was no breach of contract by Hesston. As noted with respect to the jurisdictional issue, the Certificate (of Designations, Preferences and Rights of Preferred Stock) for $1.60 Preferred Stock, which was filed with the Kansas Secretary of State, has

been treated in these proceedings as being contractual in nature. The district court cited *Rothschild Intern. Corp. v. Liggett Group*, 474 A.2d 133 (Del. 1984), as authority for this conclusion of law. The Delaware court stated that "[p]referential rights are contractual in nature and therefore are governed by the express provisions of a company's certificate of incorporation." 474 A.2d at 136. The district court further concluded that the express provisions of the Certificate "govern the preferential rights of the $1.60 Preferred Stockholders." A leading treatise states broadly that "the relation between the corporation and its stockholders is contractual in nature," 11 Fletcher Cyc. Corp., Stock and Stockholders § 5083, p. 25 (1986 rev.), and that "[i]t is unquestioned that the redemption terms of preferred stock issues create a contract between the corporation and its shareholders." 11 Fletcher Cyc. Corp., Stock and Stockholders § 5309, p. 687. The parties do not dispute this point.

This court has stated: "Regardless of the construction of a written contract made by the trial court, on appeal a contract may be construed and its legal effect determined by the appellate court." *Mark Twain Kansas City Bank v. Cates*, 248 Kan. 700, 704, 810 P.2d 1154 (1991).

The Certificate provides in pertinent part:

"5. Except as provided in paragraph 6 below, the Corporation, at the option of the Board of Directors, may redeem all or, from time to time, part of the Series A Preferred at the prices per share set forth below plus, in each case, an amount equal to accrued and unpaid dividends thereon: . . . If redeemed on or after March 16, 1985 . . . 25.00.

"The total amount payable upon such redemption is herein referred to as the 'Redemption Price.' Notice of every such redemption shall be mailed at least 30 days but not more than 60 days prior to the date designated for such redemption (herein called the 'Redemption Date') to the holders of record of the Series A Preferred so to be redeemed at their respective addresses as they appear on the books of the Corporation. . . .

"From and after the Redemption Date . . . all dividends on the shares of the Series A Preferred designated for redemption in such notice shall cease to accrue, . . . all rights of the holders of the Series A Preferred designated for redemption shall cease and terminate, except the right to receive the Redemption Price thereof upon the surrender of certificates representing the same, but without interest, . . . and the shares of the Series A Preferred designated for redemption shall not thereafter be transferred (except with the consent of the Corporation) on the books of the

Corporation, and such shares shall not be deemed to be outstanding for any purpose whatsoever.

. . . .

"6. If at any time the Corporation shall fail to pay full cumulative dividends when due on the Series A Preferred, thereafter and until such dividends shall have been paid or declared and set apart for payment, the Corporation shall not purchase or redeem any shares of Series A Preferred or shares of any other series of Preferred Stock ranking *pari passu* with the Series A Preferred or any shares of any Junior Preference Stock or Common Stock.

"Shares of Series A Preferred which have been redeemed or acquired by the Corporation or which have been converted into shares of Common Stock shall, upon compliance with any applicable provisions of law, have the status of authorized and unissued shares of Preferred Stock and may be reissued as part of a new series of such Preferred Stock to be created by resolution or resolutions of the Board of Directors."

Reduced to its essence, the dissenters' argument is that the cash-out merger was equivalent to a redemption. The Certificate does not contain express provisions governing a cash-out merger. The Certificate provisions for redemption therefore control, and, by the terms of the Certificate, the corporation was required to pay $25 plus accrued and unpaid dividends per share of $1.60 Preferred Stock. The dissenters claim that the accrued and unpaid dividends total $11.20 so that they should receive $36.20 per share. The district court concluded that the unpaid dividends totaled $7.20.

Hesston argues that a cash-out merger is a merger and that the Certificate expressly provides that a merger is not one of the corporate events which requires payment of the redemption price. Hesston also contends that the Delaware Supreme Court, which this court generally finds persuasive on corporate matters, has rejected the argument made by the dissenters. See *Rothschild*, 474 A.2d 133.

In the Delaware case, Rothschild International Corp. brought a class action against Liggett on behalf of holders of certain preferred stock of Liggett. The class was to consist of the stockholders who tendered their preferred stock in response to the tender offer of $70 of the acquiring corporation (GM) and those who did not tender but were cashed out for the same price in the subsequent merger with the GM subsidiary that had been formed to acquire Liggett. Rothschild's claims of breach of contract and breach of fiduciary duty against Liggett were "premised on a

single assertion—that GM's plan of acquisition was equivalent to a liquidation." 474 A.2d at 135. The certificate provided that the stock could not be redeemed. 474 A.2d at 136 n.1. The court stated: "On appeal, [Rothschild] contends that the takeover of Liggett via the combined tender offer and merger in essence effected a liquidation of the company thus warranting payment . . . of the $100 liquidation value set forth in Liggett's charter." 474 A.2d at 135. Rothschild's theory was rejected because the Delaware court did not view the transaction as involving a liquidation of Liggett's business. 474 A.2d at 135.

Rothschild made "two interrelated arguments: (1) that the economic effect of the merger was a liquidation of Liggett's assets 'just as if [Liggett] were sold piece meal to [GML]'; and (2) that any corporate reorganization that forcibly liquidates a shareholder's *interests* is tantamount to a liquidation of the *corporation* itself." 474 A.2d at 136. In rejecting the first argument, the court looked to the Fletcher treatise for a definition of liquidation and then determined that the plan of reorganization which had been chosen by the Liggett directors and shareholders did not come within "the well-defined meaning of that term." 474 A.2d at 136. The court viewed the reorganization as an integration of Liggett with GM and seemed to place some significance in Liggett's retaining its corporate identity. It also noted that an earlier Delaware case held that a merger is not equivalent to a sale of assets.

"In so holding, the Court followed the well-settled principle of Delaware Corporation Law that 'action taken under one section of that law is legally independent, and its validity is not dependent upon, nor to be tested by the requirements of other unrelated sections under which the same final result might be attained by different means.' " *Rothschild,* 474 A.2d at 136 (quoting *Orzeck v. Englehart,* 195 A.2d 375, 378 [Del. 1963]).

In rejecting the second argument, the court simply observed that "minority stock interests may be eliminated by merger." 474 A.2d at 136. Because a stockholder is charged with knowledge of this possibility, Rothschild could not successfully argue that the holders of the preferred stock "could reasonably expect to be paid the $100 liquidation preference in any circumstance effecting a total elimination of their investment in Liggett." 474 A.2d at 137.

The Second Circuit Court of Appeals had occasion a few years after *Rothschild* was decided to apply Delaware law in a closely aligned case, *Rauch v. RCA Corp.*, 861 F.2d 29 (2d Cir. 1988). Rauch filed a class action complaint, challenging the acquisition of RCA Corp. by General Electric Company (GE) and its wholly owned subsidiary, Gesub, Inc. The merger agreement provided that all but one of the classes of RCA stock were converted to cash, Gesub merged with RCA, and Gesub common stock was converted into RCA common stock. The one class of stock which was not converted to cash was redeemed. 861 F.2d at 29-30.

Rauch owned shares of RCA $3.50 cumulative first preferred stock (Preferred Stock), one of the cashed-out stocks.

"[Rauch] claimed that the merger constituted a 'liquidation or dissolution or winding up of RCA and a redemption of the [Preferred Stock],' as a result of which holders of the Preferred Stock were entitled to $100 per share in accordance with the redemption provisions of RCA's certificate of incorporation, that defendants were in violation of the rights of the holders of Preferred Stock as thus stated; and that defendants thereby wrongfully converted substantial sums of money to their own use." 861 F.2d at 30.

The merger agreement compelled holders of Preferred Stock to sell their shares to RCA for $40. RCA's Certificate of Incorporation stated a redemption price of $100 per share plus accrued and unpaid dividends. Rauch contended that the merger agreement "effected a redemption whose nature is not changed by referring to it as a conversion of stock to cash pursuant to a merger." 861 F.2d at 30. The court concluded that Rauch's argument was contrary to Delaware law.

The Court of Appeals stated:

"It is clear that under Delaware General Corporation Law, a conversion of shares to cash that is carried out in order to accomplish a merger is legally distinct from a redemption of shares by a corporation. Section 251 of the Delaware General Corporation Law allows two corporations to merge into a single corporation by adoption of an agreement that complies with that section. Del. Code Ann. tit. viii, § 251(c) (1983). The merger agreement in issue called for the conversion of the shares of the constituent corporations into cash. The statute specifically authorizes such a transaction:

'The agreement shall state . . . the manner of converting the shares of each of the constituent corporations into shares or other securities of the corporation surviving or resulting from the merger or consolidation and, if any shares of any of the constituent corporations are not to be converted solely into shares or other securities of the surviving or resulting corpora-

tions, *the cash . . . which the holders of such shares are to receive* in exchange for, or upon conversion of such shares *. . ., which cash . . . may be* in addition to or *in lieu of shares* or other securities of the surviving or resulting corporation. . . .'

*Id.* § 251(b) (emphasis added). Thus, the RCA-GE merger agreement complied fully with the merger provision in question, and plaintiff does not argue to the contrary.

"Redemption, on the other hand, is governed by sections 151(b) and 160(a) of the Delaware General Corporation Law. Section 151(b) provides that a corporation may subject its preferred stock to redemption 'by the corporation at its option or at the option of the holders of such stock or upon the happening of a specified event.' Del. Code Ann. tit. viii, § 151(b) (1983). In this instance, the Preferred Stock was subject to redemption by RCA *at its election*." 861 F.2d at 30-31.

In its decision dismissing Rauch's complaint, the district court observed that accepting Rauch's argument would have the effect of abrogating the conversion provisions in § 251. The Court of Appeals expanded the discussion:

"Delaware courts have long held that such a result is unacceptable. Indeed, it is well settled under Delaware law that 'action taken under one section of [the Delaware General Corporation Law] is legally independent, and its validity is not dependent upon, nor to be tested by the requirements of other unrelated sections under which the same final result might be attained by different means.' [Citation omitted.] The rationale of the doctrine is that the various provisions of the Delaware General Corporation Law are of equal dignity, and a corporation may resort to one section thereof without having to answer for the consequences that would have arisen from invocation of a different section. *See Hariton v. Arco Electronics, Inc.*, 41 Del. Ch. 74, 77, 188 A.2d 123, 125 (Del. 1963) (" 'the general theory of the Delaware Corporation Law [is] that action taken pursuant to the authority of the various sections of that law constitute acts of independent legal significance and their validity is not dependent on other sections of the Act' ") [citation omitted]." 861 F.2d at 31.

*Rothschild* was said by the Court of Appeals to be "particularly instructive" on the doctrine of independent legal significance. 861 F.2d at 32. Furthermore, the Court of Appeals stated:

"The instant action presents a most analogous situation. [Rauch] claims that the Gesub-RCA merger was, in effect, a redemption. However, there was no redemption within the well-defined meaning of that term under Delaware law, just as there had been no liquidation in [*Rothschild*]. Thus, because the merger here was permitted by law, defendants legitimately chose to structure their transaction in the most effective way to achieve the

desired corporate reorganization, and were subject only to a similar duty to deal fairly." 861 F.2d at 32.

In the present case, the district court concluded that the 1989 merger constituted neither a redemption nor a liquidation. On appeal, the dissenters take issue with this conclusion, stating that they contend that one function is tantamount to another, not that one operation actually is another.

In other pertinent conclusions of law, the district court stated:

"14. Where mergers are permitted, stockholders may be deprived of their preferential rights by merger and '(s)tockholders are charged with knowledge of this possibility at the time they acquire their shares.' Rothschild, supra, 474 A.2d at 136-37 [citations omitted].

"15. '(A)ction taken under one section of (the corporate law statute) is legally independent, and its validity is not dependent upon, nor to be tested by the requirements of other unrelated sections under which the same final result might be attained by different means.' Rothschild, supra, 474 A.2d at 136 [citations omitted].

"16. There are significant differences between a cash out merger and a redemption. In addition to the different statutory requirements, the source of the funds for each transaction is different. In a cash out merger, the funds to pay for the stock [are] provided by a third party, i.e. Fiat. In order to have a redemption, the funds to pay for the stock would have come from the corporation's own treasury, i.e. Hesston.

"17. Pursuant to the Certificate and applicable Kansas law, K.S.A. 17-6603(d), Hesston could not lawfully redeem its $1.60 Preferred Stock because it had no earnings, no surplus, a negative net worth, and its dividends remained unpaid. K.S.A. 17-6603(d); Certificate p. 6. The public policy behind this statute is to prevent a corporation from depleting its assets by redeeming its own shares at the expense of its creditors. [Citations omitted.]

"18. There is no evidence that Hesston acquired any debt or equity, representing the amount of money to be paid the $1.60 Preferred Stockholders as a result of the July 1989 Merger Agreement. Even if Hesston acquired debt or equity, it is of no legal assistance to defendant stockholders because such debt or equity could only have been a direct result of the Merger Agreement itself and could only occur after the merger was consummated. Any acquisition of debt or equity after the completion of the 1989 Merger Agreement could not provide a legally sufficient basis to recharacterize the merger as a redemption.

"19. . . . The Merger Agreement required Fiat [to] provide the cash funds to pay each stockholder $12.50 per share and it did so. The fact that Hesston may take over the funds remaining in that account at some unspecified time in the future cannot provide a basis to recharacterize this transaction as a redemption.

"20. A corporation may legitimately choose to structure a transaction in the most effective way to achieve the desired corporate reorganization subject only to a duty to deal fairly. *Rauch v. RCA Corporation*, 861 F.2d 29 (2d Cir. 1988)."

The dissenters do not cite any cases in which the argument they are making has been the basis for a decision. Their approach, therefore, is to advocate distinguishing *Rothschild* and *Rauch* on factual and legal grounds and to advocate construing the language of the Certificate in their favor, contending that there is no legally significant difference between redemption and a cash-out merger.

The dissenters would factually distinguish *Rothschild* and *Rauch* on the ground that they do not involve contractual rights in the Certificate. There is no argument, however, that they do not involve contractual rights. The only difference is that the rights in *Rothschild* and *Rauch* were embodied in the corporations' certificates of incorporation and in the present case they are embodied in the Certificate of Designation, Preferences and Rights of Preferred Stock.

The dissenters also contend that express provisions of the Certificate override the doctrine of independent legal significance by equating a voluntary liquidation or winding up with a redemption. The dissenters do not specify which Certificate provision or provisions they rely on. It appears that the following provision is the one to which they refer:

"4. In the event of dissolution, liquidation or winding up of the Corporation the holders of the Series A Preferred shall be entitled, after the debts of the Corporation shall have been paid to receive out of the assets remaining (i) if such dissolution, liquidation or winding up is voluntary, the applicable redemption price per share as determined under paragraph 5 hereof, or (ii) if such dissolution, liquidation or winding up is involuntary, twenty-five dollars ($25.00) per share, together, in either case, with all dividends thereon accrued or in arrears, whether or not earned or declared, before any payment is made or assets set apart for payment to the holders of any Junior Preference Stock or the Common Stock and shall be entitled to no further payments or distributions. If, upon dissolution, liquidation or winding up of the Corporation, the assets remaining after the payment of all debts of the Corporation shall be insufficient to pay the full amount due to holders of the Series A Preferred and to holders of other Preferred Stock of the Corporation which ranks *pari passu* with the Series A Preferred with respect to payments upon dissolution, liquidation or winding up of the Corporation, the assets so remaining shall be divided ratably among the holders of the

Series A Preferred and the holders of such other *pari passu* Preferred Stock of the Corporation then outstanding.

"Merger or consolidation with one or more corporations shall not constitute dissolution, liquidation or winding up of the Corporation."

In short, a dissolution, liquidation, or winding up of Hesston will be treated as if it is a redemption for the purpose of setting the price for Preferred Stock, but a merger or consolidation cannot constitute a dissolution, liquidation, or winding up. If this provision is construed as overriding the doctrine of independent legal significance with regard to dissolution, liquidation, or winding up and redemption, it concurrently embraces the doctrine with regard to merger or consolidation and dissolution, liquidation, or winding up.

In the courts of Kansas, the doctrine of independent legal significance has not enjoyed the prominence, at least by name, that it has in Delaware. Our research disclosed only one recent Kansas case in which it was referred to by name. In *In re Trusteeship of the Will of Daniels*, 247 Kan. 349, 353-54, 799 P.2d 479 (1990), the court discussed theories which had been used to validate pour-over trusts before the Uniform Testamentary Additions to Trusts Act was enacted. The court stated: "Incorporation by reference and independent legal significance were the doctrines most often adopted to validate the pour-over provisions. . . . *Shulsky v. Shulsky*, 98·Kan. 69, 72-73, 157 Pac. 407 (1916)." 247 Kan. at 353-54. There certainly is no suggestion in the court's remarks that the principle of independent legal significance is not an accepted concept in Kansas jurisprudence. Nor is there anything to suggest that it should not be applied in an appropriate context.

The dissenters want the court to disregard *Rothschild* and *Rauch* because those decisions turn on application of the doctrine of independent legal significance. As noted, the principle is not an entirely foreign one to the courts of this state. Furthermore, it would seem to be sound practice in the present case to appropriate the doctrine from *Rothschild* and *Rauch*, which involved many of the Delaware statutes that served as the models for the Kansas statutes involved in the present case. In *Rauch* in particular, the court identified and examined certain provisions of the Delaware General Corporation Law. Sections 151 and 160,

which govern redemption, and § 251, which governs merger, were discussed. 861 F.2d at 31. The corresponding sections in the Kansas Corporation Code are K.S.A. 1993 Supp. 17-6401, K.S.A. 17-6410, and K.S.A. 1993 Supp. 17-6701. The Kansas Comment to each of these sections states, respectively, that the Kansas provision is "nearly identical" to the Delaware model, that the Delaware provision was adopted in Kansas, and that there is "substantially no difference" between the Kansas and Delaware provisions. The principle of independent legal significance as applied in *Rothschild* and *Rauch* simply maintains the separate identities which the statutes codify for these corporate functions. Where Kansas has enacted the statutes, there is no reason not to employ the principle to safeguard the separate identities of the operations.

The dissenters must concede that merger and redemption are governed by separate and independent statutory provisions. Nonetheless, they argue that the Hesston cash-out merger and redemption should be treated as sharing precise identity because the purpose and effect of one is indistinguishable from those of the other. According to the dissenters, both transactions accomplish elimination of public ownership. They urge the court to accept the assertion that the only distinction between a cash-out merger and a redemption is the source of funds. In the present cash-out merger, the cash which was to be given in exchange for the tendered Certificates of $1.60 Preferred Stock came from Fiat through the shell subsidiary which it formed for the merger. In a redemption, the cash which would be exchanged for the tendered Certificates would be provided by Hesston, the corporation which issued the stock.

It is the dissenters' contention that the source of the funds to be exchanged for the tendered Certificates is insignificant. Their theory is that because the surviving corporation acquires the liabilities of the merging shell subsidiary, Hesston acquired in the merger the obligation to pay the price per share promised in the merger. The fact remains, however, that the money was supplied by Fiat, not by Hesston. Rather than being an insignificant detail, the differing sources of funds for a cash-out merger and a redemption seems to lie right at the center of the matter. K.S.A. 17-6603 and K.S.A. 17-6604 prohibit a corporation from depleting

its assets by retiring its own stock at the expense of creditors. In Hesston's financial condition, it could not lawfully have redeemed the $1.60 Preferred Stock. It was only the infusion of cash by Fiat that made a tender offer possible. Hesston's acquisition of the cash and liabilities of the shell subsidiary as an incident of the merger does not alter the fundamental importance of the source of the funds.

The dissenters also argue that the Certificate is ambiguous with respect to the consequences of a cash-out merger on the rights of the $1.60 Preferred shareholders. They urge that the ambiguity must be resolved in their favor because they are not the drafters of the Certificate.

The dissenters' contention of ambiguity amounts to the simple proposition that the term "cash-out merger" does not appear in the Certificate. As the Delaware court said in a slightly different context, a stock purchaser is "charged with knowledge of the possible defeasance of its stock interests upon a merger." 474 A.2d at 137. Neither notice of the "possible defeasance" nor a procedure for handling it need be included in the Certificate. The absence of a Certificate provision for a cash-out merger does not create an ambiguity in the Certificate requiring its redemption provision to be interpreted in the dissenters' favor.

The rights of the owners of $1.60 Preferred Stock in the case of a merger are stated in the following paragraph from the Certificate:

"10. In case of any consolidation of the Corporation with or merger of the Corporation into another corporation, or in case of any sale, conveyance, exchange or transfer (for cash, shares of stock, securities or other consideration) of all or substantially all of the property or assets of the Corporation to another corporation, or in case of any reorganization of the Corporation, the holder of each share of Series A Preferred then outstanding shall have the right thereafter to convert such share into the kind and amount of shares of stock and other securities and property which would have been deliverable to such holder upon such consolidation, merger, sale, conveyance, exchange, transfer or reorganization if such holder had converted his shares of Series A Preferred into Common Stock immediately prior to such consolidation, merger, sale, conveyance, exchange, transfer or reorganization."

The dissenters' argument seems to start with the premise that a cash-out merger, in which the shareholders' interests in the corporation are extinguished, is not included in the Certificate par-

agraph governing rights and procedures in the event of a merger. A cash-out merger, the argument continues, therefore is not a merger within the meaning of the Certificate. It is not a merger, in particular, within the meaning of the proviso that "[m]erger . . . shall not constitute dissolution, liquidation or winding up of the Corporation," which modifies the Certificate paragraph governing rights and procedures in the event of dissolution, liquidation, or winding up. A cash-out merger, the argument concludes, therefore entitles the shareholders to the redemption price as if the cash-out merger were a dissolution, liquidation, or winding-up. We do not agree.

The obvious shortcoming in this argument is that once the contract language has been examined, we have come full circle back to the attempt to equate the cash-out merger with redemption or liquidation. Under the reasoning of *Rothschild* and *Rauch*, that leap cannot be made. In *Rothschild*, the Delaware court expressly concluded that it was not reasonable for the shareholders to expect to be paid the liquidation preference in any and all circumstances effecting a total elimination of their investment in the corporation. By their argument, the dissenters make the same issue dispositive of the breach of contract issue in the present case.

The final issue raised by the dissenters is whether the Hesston Board of Directors breached its fiduciary duty to the dissenting shareholders. The dissenters contend that the Hesston board of directors breached its fiduciary duty to them by failing to adequately and carefully consider all factors relevant to an informed decision whether to cash them out. This court has stated that "[i]t is the established rule in this state that a director of a corporation owes a high fiduciary duty to the other stockholders of the corporation." *Sampson v. Hunt*, 222 Kan. 268, 271, 564 P.2d 489 (1977). The district court looked to 19 Am. Jur. 2d, Corporations § 2566, for a statement of fiduciary responsibility in the present circumstances:

"In the context of acquisitions, divestitures, and other reorganizations, both management and majority shareholders owe to the corporation and to the minority shareholders thereof a duty to exercise good faith, care, and diligence to make the property of the corporation produce the largest possible amount, to protect the interest of the holders of minority stock, and

to secure and pay over to them their just proportion of the income and of the proceeds of corporate property. These duties have particular emphasis in the context of a 'cash-out' or 'freeze-out' merger, which is a merger effected for no valid business purpose and resulting in the elimination of one or more minority shareholders. . . .

"In cases of corporate merger, there is no violation of fiduciary duty owed by dominant stockholders to public stockholders if there has been neither fraud, selfdealing nor price manipulation, and alternatives afforded to public shareholders are a fair price fairly determined or a statutory right to appraisal."

The dissenters contend that the district court recognized that the directors' conduct was inequitable but excused it because it was legally possible or economically justifiable. The inequity, according to the dissenters, seems to be the defeat of the expectations of the holders of $1.60 Preferred Stock. The inequity is that the $12.50 offered for $1.60 Preferred Stock was not a fair price and was not fairly determined. Aside from the contractual redemption price argument which already has been discussed, the basis for the dissenters' claim that $12.50 is not fair and was not fairly determined seems to be that the transaction was accomplished in the absence of certain procedures intended to protect their interests.

In connection with the 1987 merger agreement proposal submitted by Fiat, Hesston secured an independent fairness evaluation, designated an audit committee to study the merger proposal and recommend a course of action, and employed counsel to advise the audit committee and the board of directors. None of these steps was repeated in 1989. The district court made the following pertinent findings of fact:

"59. In April 1989, . . . a Fiat affiliate proposed to Hesston an Agreement and Plan of Reorganization, which was substantially the same as the 1987 proposed Merger Agreement. ...

"60. Since Donaldson Lufkin's fairness opinion in 1987, Hesston had sustained additional significant losses, resulting in continuing deterioration of stockholder equity. As of December 31, 1988, the negative net worth of Hesston was $78.7 million as compared to $18.2 million at December 31, 1986.

"61. Hesston requested [retained counsel] to review the 1989 merger proposal and to advise whether another fairness opinion was required in view of the 1989 circumstances. [Counsel] concluded that in light of Hesston's worsened financial condition, the fact that Fiat continued to be committed to pay $12.50 for any outstanding shares, the fact that the merger

proposal remained substantially the same as proposed in 1987, and the cost of such an opinion ($250,000), a new fairness opinion would be redundant and was not required.

. . . .

"63. On April 20, 1989, the Hesston Board of Directors (Richard F. Hrdlicka, James Gaeddert and Lodovico Crescenzi) again considered the Fiat proposal. After discussing Hesston's worsened financial condition, Fiat's extensive open market purchases at prices of $12.50 or less, and the decision of Allied to accept $12.50 per share in March 1989, after two years of litigation, the Board determined that the $12.50 per share merger price was fair from a financial point of view. After full consideration of the financial and legal considerations, the Hesston Board of Directors approved the Merger Agreement and recommended that the $1.60 Preferred Stockholders vote for approval of the Merger Agreement because it was in the best interest of Hesston and its stockholders and the price offered by the merger was fair.

"64. . . . The Hesston Board of Directors clearly felt that the worsened financial condition of the company made the expenditure of funds for independent investigation and advice to be irresponsible and a redundant exercise in light of the 1987 advice it had received. The Board felt that the incurring of such expense was not in the best interests of shareholders, despite the independent advice it would have provided, and would have further depleted the limited financial resources of Hesston Corporation."

The district court's pertinent conclusions of law on this issue include the following:

"27. It is not necessary for a corporation to show a 'valid corporate purpose' for eliminating minority stockholders. The business purpose requirement was eliminated in Delaware in *Weinberger v. UOP*, 457 A.2d 701, 711 (Del. 1983).

"28. A corporation is required to disclose all material facts relevant to a merger. *Bershad v. Curtiss-Wright Corp.*, 535 A.2d 840, 846 (Del. 1987).

. . .

"29. The defendants have not stated, or proven, a separate claim for breach of fiduciary duty based on a claim of *de facto* redemption because it is controlled by the contractual terms of the Certificate of Designations. [Citations omitted.]

"30. Applying the above standards of law to the facts of this case, the Court finds that there has been no violation of fiduciary duty on the part of the Hesston Board of Directors in approving either the 1987 or 1989 Merger Agreements. The Court finds neither fraud, selfdealing nor price manipulation have occurred. The Court finds that the failure on the part of the Board of Directors to obtain an independent analysis and evaluation of the 1989 Merger Agreement did not constitute a breach of fiduciary duty under the special circumstances of this case. The decision of the Board

involved a rational balancing of the known financial facts against the considerable expenses ($250,000.00) of obtaining an independent analysis. . . .

"31. The Court further finds the fact that the Board of Directors of Hesston Corporation failed to obtain an independent fairness evaluation as to the 1989 Merger Agreement to be offset by the statutory right of appraisal which the minority shareholders enjoyed under Kansas corporate law. As noted above, this Court has previously determined through an appraisal proceeding that the fair value of the $1.60 Preferred shares was $4.90. Therefore the Court finds that the $12.50 offered as a part of the 1989 Merger Agreement was a fair price for the minority shareholders.

. . . .

"33. . . . [T]here was in fact in this case a legitimate business purpose [for the merger]. That purpose was to allow Hesston Corporation to participate in the joint venture with J.I. Case for engineering and manufacturing hay and forage equipment on the terms mandated by Case.

"34. . . . The Board's recommendation and approval of the 1987 and 1989 Merger Agreement[s], including the $12.50 cash-out price contained therein, was fair and reasonable in light of all relevant circumstances. Neither Hesston, nor its directors, breached any fiduciary duties to the stockholders."

The dissenters have furnished scant authority to support their argument. They cite *Hanson Trust PLC v. ML SCM Acquisition, Inc.*, 781 F.2d 264 (2d Cir. 1986); *Rabkin v. Philip A. Hunt Chemical Corp.*, 498 A.2d 1099 (Del. 1985); and *Smith v. Van Gorkom*, 488 A.2d 858 (Del. 1985), as cases with facts similar to those in the present case in which fiduciary responsibilities were held to have been breached. These cases, however, are not factually similar to the present case.

In *Rabkin*, shareholders challenged the merger of Hunt with its majority stockholder, Olin Corp. When Olin bought 63.4% of the outstanding shares of Hunt's common stock on March 1, 1983, Olin agreed to pay $25 per share if Olin acquired the remaining stock within one year. 498 A.2d at 1101. A few weeks after the one-year period elapsed, Olin and Hunt issued a joint press release announcing a cash-out merger. 498 A.2d at 1102. Olin's acquisition of the remaining shares was to be for $20 per share. The outside financial advisor, Merrill Lynch, advised that $20 per share was fair, "but that the range of values for the common stock was probably $19 to $25 per share." 498 A.2d at 1103. Outside directors recommended that Olin consider increasing the price, Olin refused, and the outside directors capitulated. 498 A.2d at 1103. In these circumstances, the Delaware court agreed

with the minority shareholders that $20 per share was inadequate and that Olin unfairly manipulated the timing of the merger to its advantage. 498 A.2d at 1107. In contrast, in the present case the offer of $12.50 per share remained stable from the time of the 1987 merger despite Hesston's worsening financial condition.

*Smith* bears little factual similarity to the present case:

"On the record before us, we must conclude that the Board of Directors did not reach an informed business judgment on September 20, 1980, in voting to 'sell' the Company for $55 per share pursuant to the Pritzker cash-out merger proposal. Our reasons, in summary, are as follows:

"The directors (1) did not adequately inform themselves as to Van Gorkom's role in forcing the 'sale' of the Company and in establishing the per share purchase price; (2) were uninformed as to the intrinsic value of the Company; and (3) given these circumstances, at a minimum, were grossly negligent in approving the 'sale' of the Company upon two hours' consideration, without prior notice, and without the exigency of a crisis or emergency.

. . . .

". . . No written summary of the terms of the merger was presented; the directors were given no documentation to support the adequacy of $55 price per share for sale of the Company; and the Board had before it nothing more than Van Gorkom's statement of his understanding of the substance of an agreement which he admittedly had never read, nor which any member of the Board had ever seen." 488 A.2d at 874.

In *Hanson Trust,* the Court of Appeals observed that the directors' actions were not as grossly negligent as the actions of the directors in *Smith,* but they did fail "to take many of the affirmative directorial steps that underlie [a] finding of due care" under New York law. 781 F.2d at 275. The court stated that

"the SCM directors, in a three-hour late-night meeting, apparently contented themselves with their financial advisor's conclusory opinion that the option prices were 'within the range of fair value,' although had the directors inquired, they would have learned that Goldman Sachs had not calculated a range of fairness. There was not even a written opinion from Goldman Sachs as to the value of the two optioned businesses. [Citation omitted.] Moreover, the Board never asked what the top value was or why two businesses that generated half of SCM's income were being sold for one third of the total purchase price of the company under the second LBO merger agreement, or what the company would look like if the options were exercised. [Citation omitted.] . . . Also, as was noted in *Van Gorkom,* the directors can hardly substantiate their claim that Hanson's efforts created an emergency need for a hasty decision, given that Hanson would not acquire shares under the tender offer until September 17. [Citation omit-

ted.] . . . In short, the SCM directors' paucity of information and their swiftness of decision-making strongly suggest a breach of the duty of due care." 781 F.2d at 275.

In contrast with *Rabkin*, *Smith*, and *Hanson Trust*, the merger in the present case was not the product of a hasty decision. It was not railroaded right by uninformed directors. Nor was the tender offer price per share in the lower range of values for the $1.60 Preferred Stock. *Rabkin*, *Smith*, and *Hanson Trust* were marked by the absence of directors' due care. In the present case, care was exercised in connection with the 1987 phase of Fiat's acquisition of Hesston. From that point to the inexorable takeover in 1989, the financial condition of Hesston worsened, but the dissenters have not shown that the economic slide or any other corporate circumstance was a counterindicator for the 1989 cash-out of preferred stock. We find no support for the dissenters' claim of Hesston's failing to consider all factors with a showing of any neglected factors. Nor have the dissenters seriously suggested that Hesston's 1989 circumstances presented any realistic options other than merger.

In its cross-appeal, Hesston contends that the dissenters and their counsel acted in violation of K.S.A. 1993 Supp. 60-211 in continuing to pursue their counterclaims after they should have known there was not any factual or legal support for their allegations. Hesston asserts that its counsel brought *Rothschild* and *Rauch* to the attention of the dissenters' counsel in April 1990, that they ignored the legal authority, and that they failed to produce any of their own. Then, according to Hesston, the dissenters refused to reexamine or relinquish their position when discovery yielded no factual basis for their claim.

In August 1991, at the time of the trial of this matter, Hesston filed a motion to assess attorney fees and expenses as costs or sanctions against the dissenters. It is recited in the motion that it is pursuant to K.S.A. 60-2007(b) and 60-211. The district court conducted a hearing on the motion and, in May 1992, issued a lengthy written denial. On appeal, Hesston focuses exclusively on K.S.A. 1993 Supp. 60-211.

The dissenters state that the standard for appellate review is abuse of discretion. Hesston contends that because the dissenters did not present evidence at trial, there is here no dispute in the

factual details or testimony. For this reason, Hesston relies on *Giblin v. Giblin*, 253 Kan. 240, 254, 854 P.2d 816 (1993), and argues that the district court's decision is to be reviewed de novo.

In *Giblin*, the court reviewed the rules applicable here. It quoted the principle that the appellate court may determine de novo what the facts establish where the controlling facts are based on written or documentary evidence, 253 Kan. at 253, and followed it with the proviso that where oral testimony has been heard, de novo determination of what the facts establish generally is not appropriate. 253 Kan. at 253. In *Giblin*, however, where very brief uncontroverted oral testimony had been given by one witness, the court concluded that the circumstances did not preclude de novo review. 253 Kan. at 253-54. In contrast, in the present case the district court heard several days of testimony from trial witnesses. Thus, in the present case, the appellate court's function is to determine whether substantial competent evidence supports the district court's finding that the dissenters had reasonable bases in fact for their claims. See 253 Kan. at 252.

In its memorandum decision denying the motion for sanctions, the district court referred to *Reyna v. General Group of Companies*, 15 Kan. App. 2d 591, 814 P.2d 961, *rev. denied* 248 Kan. 996 (1991), as "[t]he most helpful current analysis of Kansas law." From *Reyna*, the district court derived its "two-part analysis addressing whether a reasonable basis in fact for the claim existed at the time it was made and whether the claim was pursued in good faith." 15 Kan. App. 2d 591, Syl. ¶ 6. After reviewing the theories of the parties and the evidence, the district court concluded as follows:

"Thus, while it is clear to me that Hesston Corporation should prevail on the merits of this case, I do find that the defendant stockholders have been able to raise, even through the evidence presented nearly exclusively by Hesston Corporation, bona fide issues with respect to the manner in which the 1989 merger agreement was conducted. While these arguments could have been better supported, in the Court's opinion there was a good faith basis for their presentation to the Court."

On appeal, Hesston argues that this court's decision in *Fankhauser v. Bank IV Emporia*, 251 Kan. 217, 833 P.2d 1002 (1992), supplants *Reyna*, on which the district court relied. Hesston con-

tends that *Fankhauser* implemented the legislature's 1986 changes to K.S.A. 60-211, and among those changes was the removal of the district court's discretion. Hesston argues that the district court is required to impose sanctions where a violation of K.S.A. 1993 Supp. 60-211 has been shown. After quoting the current and earlier versions of 60-211, this court stated:

"[P]rior to the 1986 amendment of K.S.A. 60-211, a court was empowered to levy sanctions against an attorney who willfully violated the statute but only where the attorney was found to have acted knowingly and in bad faith. Even if the requisite findings were made, the court had discretion as to whether or not to impose sanctions. The 1986 statutory amendments substantially altered the operation of the statute. Findings of willful and knowing conduct and bad faith by the attorney were no longer necessary, and the imposition of sanctions was no longer a matter of judicial discretion." 251 Kan. at 219.

The inquiry, therefore, is simply whether the dissenters and their counsel violated K.S.A. 1993 Supp. 60-211. The statute provides in pertinent part:

"Every pleading, motion and other paper provided for by this article of a party represented by an attorney shall be signed by at least one attorney of record in the attorney's individual name, and the attorney's address and telephone number shall be stated. . . . The signature of a person constitutes a certificate by the person that the person has read the pleading; that to the best of the person's knowledge, information and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification or reversal of existing law; and that it is not imposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation. . . . If a pleading, motion or other paper provided for by this article is signed in violation of this section, the court, upon motion or upon its own initiative upon notice and after opportunity to be heard, shall impose upon the person who signed it or a represented party, or both, an appropriate sanction, which may include an order to pay to the other party or parties the amount of the reasonable expenses incurred because of the filing of the pleading, motion or other paper, including reasonable attorney fees."

The basis for Hesston's argument relating to the claim for breach of contract lies in the requirement of 60-211 that claims be "warranted by existing law or a good faith argument for the extension, modification or reversal of existing law." Central to the dissenters' breach of contract claim is their theory that the cash-out merger is the functional equivalent of redemption. Hesston argues that, far from being warranted by existing law, this

premise is contrary to all existing corporate law. It appears that all existing corporate law consists of *Rothschild* and *Rauch*. The dissenters' position is that the law was undecided in Kansas, the contract on which their claim was based was unique and required construction under Kansas law, and the applicability in Kansas of the doctrine of independent legal significance which was a factor in the outcomes of *Rothschild* and *Rauch* was undetermined. Even if not warranted by existing law, their claims seem to have been warranted by a good faith argument that the Kansas court should modify the approach taken under Delaware law.

Hesston reiterates that there was no legal authority for the dissenters' position. This, of course, cannot be the test for a violation of 60-211. Issues of first impression will arise in Kansas which have not been litigated elsewhere or which have not been litigated widely. Litigants and creative advocates must not be prevented from developing new theories or presenting new causes of action in the courts of this state merely because they are untested or have not been received favorably in some other jurisdiction. Where the weight of authority is overwhelmingly unfavorable to a litigant's position or there is controlling authority against it, there may be a question whether the claim is warranted by a good faith argument for extension, modification or reversal. Neither of those circumstances is presented here.

The dissenters point out that Hesston failed to file a dispositive motion based on *Rothschild* and *Rauch*. This should not be a test for entitlement to sanctions any more than the dissenters' lack of legal authority should be a test for a violation of 60-211. It is interesting, though, why Hesston thinks the dissenters should have capitulated upon being made aware of *Rothschild* and *Rauch* when it did not attempt to circumvent trial on this issue by filing such a motion.

Hesston's argument with regard to the claim for breach of fiduciary duty is less clear-cut than its argument on the breach of contract. Hesston complains that there is no reasonable basis in fact for the claim. There seem to be two parts to its argument.

First, according to Hesston, the conduct which the dissenters complained about is blameless conduct. The district court did not see it quite that way. Although concluding that fiduciary duties

had not been breached, the district court recognized that tissue-thin ice had been skated on:

"[A]t the time the shareholders asserted the claims against Fiat, the Court believes that a strong argument could be made that the influence of Fiat was so pervasive that by 1989 the Hesston Corporation Board of Directors had become a virtual alter ego of Fiat management. The fact remains that the Hesston Corporation Board did not obtain independent financial consultation as to the wisdom of the 1989 merger agreement, and did not follow the provisions of Kansas law with regard to the holding of annual meetings and did not precisely follow the method for selection of board members when preferred dividends became in arrears. The Court found, after hearing all of the evidence concerning the matter, that there were good and sufficient reasons for the course of conduct of the Hesston Corporation Board, and that its fiduciary duty to its shareholders, both majority and minority, was not breached by their facial failure to follow customary practices in the financial and corporate world. The Court found that the financial exigencies of Hesston Corporation in 1989 were so extreme that entering into the merger agreement at that time represented a wise and prudent course of action. But saying this does not mean that the minority shareholders did not have a point about the intimate relationship between Fiat and Hesston Corporation, or about its departure from the norms of usual practice and, indeed, past Hesston Corporation practices in obtaining independent financial advice, holding corporate meetings, and keeping its shareholders notified."

Second, according to Hesston, the dissenters did not establish a causal link between the fiduciary shortcomings and the amount they claimed in damages, $36.20 per share. We fail to see what significance this has on the issue of sanctions. There was no breach established; the issue of damages was not reached. In any event, the dissenters' theory was that they were contractually entitled to $36.20 per share. Any action taken by Hesston which reduced their entitlement was, according to the dissenters, in breach of its fiduciary duties to the shareholders. Thus, the computation of damages was the same for both claims.

The district court gave careful consideration to the arguments made by Hesston and concluded that the dissenters presented genuine issues of fact and law as to the conduct of the 1989 merger. On appeal, Hesston has added nothing to its arguments which convinces this court to depart from the decision reached by the district court. We conclude there was substantial competent evidence to support the district court's finding that neither

the dissenters nor their counsel violated K.S.A. 1993 Supp. 60-211.

We tend to expect a great deal from our district court judges and those who assist them. We seldom acknowledge a job well done. We would be remiss if we did not acknowledge the excellent job done by Judge Richard B. Walker in the present case.

Affirmed.